[Cite as *Starling v. Ohio Dept. of Dev. Disabilities*, 2022-Ohio-2225.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Cynthia Starling, on behalf of the    :
Estate of Nicholas Starling, Deceased,

   :

      Plaintiff-Appellant,                 No. 21AP-345

   :       (Ct. of Cl. No. 2019-00747JD)

v.

   :       (REGULAR CALENDAR)

Ohio Department of
Developmental Disabilities,    :

      Defendant-Appellee.      :

---

D E C I S I O N

Rendered on June 28, 2022

---

**On brief:** *Spangenberg Shibley & Liber LLP*, *Stuart E. Scott*, and *Jeremy A. Tor*, for appellant. **Argued:** *Stuart E. Scott*.

**On brief:** *Dave Yost*, Attorney General, *Eric A. Walker*, and *Amy S. Brown*, for appellee. **Argued:** *Amy S. Brown*.

---

APPEAL from the Court of Claims of Ohio

JAMISON, J.

{¶ 1} Plaintiff-appellant, Cynthia Starling, on behalf of the Estate of Nicholas Starling, Deceased, appeals from a judgment of the Court of Claims of Ohio in favor of defendant-appellee, Ohio Department of Developmental Disabilities ("ODDD"). For the reasons that follow, we affirm in part, and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Appellant brought this action in the Court of Claims against ODDD, in her individual capacity and on behalf of the estate of her late son, Nicholas Starling ("Nick"), alleging claims for negligence, battery, and medical negligence. At all relevant times, Nick was a resident at the Warrensville Developmental Center ("WDC"), a residential mental

health facility operated by appellee. Nick was developmentally disabled from birth with a diagnosis of impulse control disorder, paranoia, schizophrenia, and autism.

{¶ 3} On April 13, 2018, at the age of 28, Nick was admitted to WDC as a voluntary short-term admission. Nick had previously received in-patient treatment for his aggressive behaviors at other facilities in the months prior to his admission to WDC. On admission, WDC noted that Nick "had been in and out of the hospital and nursing home facilities since November 2017 due to his aggressive and destructive behaviors." (WDC Initial Social History, Pl.'s Ex., at 47.)

{¶ 4} The evidence shows that, after assessing Nick's needs, WDC staff developed a plan of care known as a person center plan ("plan"). There is no dispute that the plan permitted WDC staff to use manual physical restraints to calm Nick when his violent outbursts represented a risk of imminent harm to himself or others. The "bearhug" technique is one of the manual physical restraint techniques authorized by the plan. (My Individual Plan, Pl.'s Ex., at 17.) Appellant signed and approved the plan in her capacity as Nick's guardian.

{¶ 5} WDC employs Therapeutic Program Workers ("TPW") to work with the residents on a daily basis. WDC also uses a video-only surveillance system as a security measure at the facility. (Pl.'s Ex. 9.) At approximately 1:11 p.m. on June 24, 2018, Nick can be seen on video surveillance leaving the dining room after engaging in a verbal disagreement with TPW Bridget Bailey. When TPW Dionte Baskerville followed Nick into the hallway, Nick struck or shoved Baskerville in the chest with an open hand. The video also shows Nick shouting at Baskerville in an animated fashion, wagging his finger at Baskerville and upending a trash bin as he enters the game room. In the game room, Nick began tossing board games in Baskerville's general direction as Baskerville retreats.

{¶ 6} The video then shows Nick leaving the game room and reentering the dining room which was occupied by Bailey, another WDC employee, and a resident. As one of the TPW's escorts the resident out of the dining room, Nick begins throwing items around. Nick picked up a toaster and threw it, before grabbing a chair and tossing it in Baskerville's general direction but not directly at Baskerville. Baskerville continued to follow Nick as he moved through the dining room and throwing more objects, while another TPW employee can be seen using the telephone. The evidence reveals that the employee was calling for assistance with Nick.

{¶ 7}    At approximately 1:15 p.m., after Nick is seen knocking a potted plant off of a shelf and then throwing some papers at Baskerville, Baskerville closed the distance between the two and attempted to physically restrain Nick using a bear hug technique. Baskerville grabbed Nick from behind and wrapped his arms around Nick's torso in an effort to pin Nick's arms in front of him. Nick then moves towards a table and bends forward at the waist in an apparent effort to free his arms. Baskerville also appears to be placing one of his feet between Nick's feet, as if to throw Nick off balance.

{¶ 8}    The video shows Nick managed to break free from the initial hold that Baskerville applied by freeing his arms, raising up and beginning to move away. Baskerville attempts the bear hug a second time and struggles to hold on to Nick's sizeable waist. Nick continues to take short steps forward in an effort to free himself from Baskerville's grasp as Baskerville struggles to hold on. With Baskerville essentially hanging on Nick's back and being dragged across the floor, the two men fall awkwardly to the floor with Baskerville on top of Nick.

{¶ 9}    At 8:15 p.m., Tammy Tayman, R.N., a WDC nurse, was asked to examine Nick's right leg as it appeared swollen, and Nick was unable to walk on it. According to Tayman, Nick's right leg presented as "slightly edematous." (Pl.'s Ex. 1 at 55.) Tayman consulted Dr. Gary Greenspan, a physician ODDD had contracted with to provide medical care and treatment to WDC's residents. Dr. Greenspan ordered an x-ray, which was performed on the morning of June 25, 2018. WDC subsequently transferred Nick to a local hospital where he was diagnosed with a fibial plateau fracture.

{¶ 10}    Nick was treated and discharged from the hospital to appellee's care wearing a knee immobilizer. The hospital provided appellee with the detailed instruction upon discharge.[1]

---

[1] The discharge instructions, admitted into evidence as Plaintiff's Exhibit 7, provide: "Please check the patients pedal pulse every 4 hours for the next 24 hours. Plassively dorsiflex and plantarflex his foot and check for severe pain with these movements. Have the patient wiggle his toes every 4 hours for the next 24 hours. If any of these are abnormal, please bring the patient back to ED immediately. These may be early signs of compartment syndrome.
The patient can have tylenol and ibuprofen as needed for pain. * * * YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY, EITHER HERE OR AT THE NEAREST EMERGENCY DEPARTMENT, IF ANY OF THE FOLLOWING OCCURS: Severe increase in pain or swelling in the injured area. New numbness or tingling in or below the injured area. Your foot gets cold and pale. This could mean that the foot has a problem with its blood supply." (Emphasis sic.)

{¶ 11} On June 28, 2018, Nick was found unresponsive in his bed. He was transported to the hospital in full cardiac arrest where he was pronounced dead. The Cuyahoga County Medical Examiner ruled Nick's death a "homicide." (Medical Examiner's Verdict, Pl.'s Ex. at 5.) The medical examiner's autopsy report provides the following "conclusion":

> Based upon the history and autopsy findings, it is my opinion that Nicholas Starling, a 28-year old man, died as the result of pulmonary artery thromboemboli due to deep vein thrombos es of the right lower extremity due to right tibia fracture. Obesity is a contributory condition. Per investigation, [Nick] was injured during a physical restraint procedure during a psychotic episode.

*Id.* at 8.

{¶ 12} Appellant filed the instant wrongful death action in the Court of Claims on June 21, 2019, alleging negligence, medical negligence, and battery. A judge of the Court of Claims held a bench trial beginning on March 15, 2021. On June 1, 2021, the court issued a decision and judgment entry in favor of appellee. The Court of Claims determined that appellant failed to prove any of the claims in the complaint by a preponderance of the evidence. Appellant timely appealed to this court from the decision of the Court of Claims.

## II. ASSIGNMENTS OF ERROR

{¶ 13} Appellant assigns the following as trial court error:

> [1.] The trial court's ruling in favor of the Defendant on the negligence claim relating to the physical restraint [Nick] was against the manifest of the evidence.
>
> [2.] The trial court's ruling in favor of the Defendant on the battery claim was error and against the manifest weight of the evidence.

## III. STANDARD OF REVIEW

{¶ 14} In conducting a manifest weight review of a civil action tried to the court, without a jury, "this court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered." *Crenshaw v. Michael J.'s Auto Sales*, 1st Dist. No. C-200154, 2021-Ohio-1468, ¶ 16, citing *Eastley v. Volkman*, 132 Ohio St.3d

328, 2012-Ohio-2179, ¶ 20. "In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses." *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 28, citing *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. "[B]ecause 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion, it does not matter that the burden of proof differs in criminal and civil cases. In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley* at ¶ 19.

{¶ 15} In conducting such review, " 'we are guided by the presumption that the jury, or the trial court in a bench trial, "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *Cervantes* at ¶ 28, quoting *Cattledge* at ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 14.

## IV. LEGAL ANALYSIS

### A. Assignments of Error

#### 1. First Assignment of Error

{¶ 16} In appellant's first assignment of error, appellant argues that the judgment in appellee's favor, as to appellant's negligence claim, is against the manifest weight of the evidence because appellant presented overwhelming evidence that appellee breached a duty of care owed to appellant when Baskerville attempted to physically restrain Nick and that appellee's negligence proximately caused Nick's injury and subsequent death.[2]

{¶ 17} "A cause of action for negligence requires proof of (1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 23, citing *Menifee v. Ohio Welding Prods., Inc.,* 15 Ohio St.3d 75, 77 (1984). *See also Mussivand v. David*, 45 Ohio

---

[2] Appellant has not assigned error with respect to the judgment in appellee's favor on the medical negligence claim.

St.3d 314, 318 (1989); *Di Gildo v. Caponi*, 18 Ohio St.2d 125 (1969). "The scope of any duty owed is the standard of care that an actor must exercise." *Cromer* at ¶ 27, citing *Commerce & Industry Ins. Co. v. Toledo,* 45 Ohio St.3d 96, 98 (1989); *Berdyck v. Shinde,* 66 Ohio St.3d 573, 578 (1993). "The minimum standard of care expected under any circumstances is to exercise that degree of care and caution that an ordinarily careful and prudent person would exercise under similar circumstances." *Cromer* at ¶ 27, citing *Gedeon v. E. Ohio Gas Co.*, 128 Ohio St. 335, 338 (1934). *See also Thompson v. Ohio Fuel Gas Co.*, 9 Ohio St.2d 116 (1967). *See also* 2 Restatement of the Law 2d, Torts, Section 281.

{¶ 18} In support of the negligence claim, appellant presented the testimony of an expert witness who provided testimony as to the applicable standard of care owed to appellant and appellee's breach of the standard of care. Tina Aown, R.N., appellant's expert, currently works for a company known as HCA Healthcare as a Senior Clinical Director. Before receiving her credentials as a Registered Nurse, Aown worked as a Psychiatric Technician in California, a position similar to an L.P.N. in Ohio. As a Psychiatric Technician, Aown received specialized training in the care of patients with mental illness and/or developmental disabilities.

{¶ 19} Aown went back to school after obtaining her credentials as a Registered Nurse to earn her B.A. in Health Management and a Master's in Nursing and Clinical Research. In 1989, Aown obtained board certification as a Psychiatric and Mental Health Nurse. Aown testified that she is a licensed R.N. in nine states, including Ohio.

{¶ 20} Aown joined HCA Healthcare in 2012 as a Clinical Director providing support for some of HCA's behavioral health programs. She was promoted to Senior Clinical Director in 2016, and in that capacity, she provides nationwide support for all of HCA's behavioral health services.

{¶ 21} Aown testified that she was contacted by appellant's trial counsel in 2019 and asked to review the case. In preparing to offer her opinion testimony at trial, Aown reviewed Nick's relevant medical records, WDC's policies and procedures, pertinent WDC personnel files, the initial incident report, depositions of the WDC personnel involved in the incident, and the videotape of the incident.

{¶ 22} During her direct examination, Aown informed the court of the overarching concern in responding to any crisis involving patients with mental and/or developmental disabilities:

> We always want to exhaust less restrictive interventions. So from a patient rights perspective, we all have the right to be treated in the least restrictive environment, and there are inherent risks with restraint. It can result in harm. And so we don't want to do anything that is going to place our patient or our client in harm's way. And so we want to use every other intervention that is available to us and only use restraint or seclusion as a last resort. We're trying to - - our intent here is to maintain the safety of our patient as well as the safety of the staff.

(Mar. 17, 2021 Excerpted Trial Testimony of Tina Aown, R.N., at 14-15.)

{¶ 23} With regard to intervention in the form of physical restraint, Aown told the court that the standard of care permitted the use of physical restraint only under limited circumstances. Aown testified that manual physical restraint may be used on a mentally or developmentally disabled patient only when the patient's conduct creates a risk of imminent physical harm to the patient or others. Aown testified that before a caregiver may use manual physical restraint "[t]here needs to be clear and present imminent risk of harm over others to use any level of restraint." (Excerpted Trial Testimony of Tina Aown, R.N., at 27.)

{¶ 24} Aown explained that in order for an individual caregiver to safely apply the bear hug technique, the caregiver must wrap both arms around the patients arms and torso in such a way as to pin the patients arms in front of the patient, one across the other. According to Aown, this technique may also be safely applied by two individuals working in unison on a single patient.

{¶ 25} As the videotape of the incident was played in the courtroom, Aown was asked her opinion whether intervention in the form of physical restraint was required on June 24, 2018, and if so, whether the technique employed by Baskerville was appropriate. Aown offered the following opinion:

> Q. Let's turn to the physical restraint applied by Mr. Baskerville * * * to restrain Nick at all?
>
> A. No. There was no evidence that [Nick] was in imminent risk to either himself or to anyone in the vicinity.
>
> Q. Well, if hypothetically restraint was warranted, would a single person bear hug have been the appropriate restraint technique to use?
>
> A. I would never have advised this in this particular situation. And the reason for that is that [Nick] was a large man. I believe

he weighed in the vicinity of 275 pounds. Mr. Baskerville acknowledged that he was approximately half that size in stature. And so it would not be safe to use a single-person hold on someone who is nearly twice your size.

(Excerpted Trial Testimony of Tina Aown, R.N., at 23-24.)

{¶ 26} Counsel also sought Aown's opinion as to the propriety of Baskerville's attempt to reapply the bear hug technique after the failed first attempt:

Q. Well, we know that Mr. Baskerville applied the bear hug technique, Nick broke free, and Mr. Baskerville attempted to reapply the restraint. Was it reasonable for him to reapply or attempt to reapply the bear hug?

A. No, that was not reasonable either. A reasonable decision would have been, okay, the bear hug didn't work, the patient broke free from it, let's regroup. Ms. Bailey was in the vicinity, was not caring for any other residents at that moment. And a more reasonable decision would have been to confer with Ms. Bailey and partner with Ms. Bailey to determine the next appropriate steps.

(Excerpted Trial Testimony of Tina Aown, R.N., at 24.)

{¶ 27} Appellee relied on the testimony of Baskerville, WDC supervisor Daniel Singer, and WDC Superintendent Patricia Nixon.

{¶ 28} Baskerville was hired by WDC as a temporary TPW in August 2015. He had no prior work experience in the field. According to Baskerville, he was promoted to part-time TPW in February 2016, but he worked full-time hours. Baskerville stated that on June 24, 2018, he was not assigned to Nick's unit but he was covering for another TPW in that unit. Baskerville testified that he reviewed Nick's plan prior to assuming his duties but he acknowledged that he had worked with Nick only once prior to the incident in question and that Nick had not acted out during the occasion.

{¶ 29} Baskerville recalled that he had used the bear hug technique on other patients prior to June 24, 2018. When asked if he had successfully performed the technique, he responded "[s]ometimes, yes; sometimes, no." (Dec. 17, 2020 Dionte Baskerville Trial Dep. at 29.) Baskerville testified that whenever a patient breaks free of an attempted bear hug, he was trained to "immediately back up and either reattempt or just try to deescalate until more help arrives." (Dionte Baskerville Trial Dep. at 29.)

{¶ 30} During his cross-examination, Baskerville responded to questions from appellant's trial counsel as the video of the incident played in the courtroom. Concerning

the critical moments immediately prior to his first attempt to apply the bear hug technique, Baskerville testified as follows:

> Q. Has he done anything more than just destroyed some of the property in the area?
>
> A. No, he hasn't done anything more than that.
>
> Q. *Okay. And so is there any reason at this point to use any kind of physical restraint on him?*
>
> A. *No.*
>
> Q. *So just for the record, we're at 1:15 and 17 seconds and I will keep playing.*
>
> *(Video Playing.)*
>
> Q. (By Mr. Tor): All right. So at 1:15 and just before 21 seconds, it looks like you wrapped your arms around Nick to - - I guess, use the bear hug technique?
>
> A. Yes
>
> Q. Why did you do that?
>
> A. Because he was continuing to escalate. He didn't deescalate the situation. He was going to continue to destroy property.
>
> Q. But I thought you told that me destroyed property, in and of itself, is not a reason to use a physical restraint on a resident? [sic]
>
> A. I mean, as a result, he's destroying property that doesn't even belong to him. I want to stop any more property destruction, to halt the entire situation, attempt to deescalate the situation. I had tried every other avenue of deescalating I had available to me.
>
> Q. *All right. And you used the physical restraint to prevent him from destroying any more property?*
>
> A. *Yes, and possibly harming himself.*

(Emphasis added.) (Dionte Baskerville Trial Dep. at 63-64.)

{¶ 31} Our review of the videotape reveals that Nick's conduct during the intervening four seconds between 1:15 and 17 seconds, when Baskerville acknowledged physical restraint was unnecessary, and 1:15 and 21 seconds, when he initiated the bear hug technique, consisted of throwing papers in Baskerville's direction. The videotape reveals no conduct in those four seconds that could have caused a reasonable person in Baskerville's position to believe that Nick's conduct had escalated to the point where

physical restraint was necessary to protect Nick from imminent harm, as Baskerville maintained.

{¶ 32} Moreover, in *State v. Kaufhold*, 12th Dist. No. CA2019-09-148, 2020-Ohio-3835, the court considered the meaning of the word "possible" in analyzing witness testimony. The *Kaufhold* court concluded as follows: "The word 'possible' is defined by the Merriam-Webster online dictionary as 'being within the limits of ability, capacity, or realization.' Similarly, the word 'could' is defined by the Merriam-Webster online dictionary as the past tense of the word 'can,' which is separately defined as being 'physically or mentally able to.' Testifying that something was 'possible' is essentially the same as testifying that something 'could' have happened." *Id*. at ¶ 45. Applying the Merriam-Webster definition of the word "possible," the *Kaufhold* court held that a "toxicologist testifying that it was 'possible' that [the victim's] 'unconsciousness or memory loss' was caused by her combining medication with alcohol is essentially the same as the state arguing during its closing argument that [the victim] 'could' have suffered 'a blackout' when she combined her medication with alcohol." *Id*.

{¶ 33} By contrast, in the context of domestic violence civil protection orders "imminent" means "ready to take place," or "near at hand." *See Fleckner v. Fleckner*, 177 Ohio App.3d 706, 2008-Ohio-4000, ¶ 20 (10th Dist.). A risk of imminent harm connotes " 'the belief of the victim that harm would occur immediately or, in the alternative, that the defendant will cause immediate physical harm.' " *State v. Baker*, 12th Dist. No. CA2020-08-086, 2021-Ohio-272, ¶ 43, quoting *State v. Fisher*, 197 Ohio App.3d 591, 2011-Ohio-5965, ¶ 17 (2d Dist.).

{¶ 34} When viewed in proper context, Baskerville's testimony establishes that he believed the standard of care permitted use of physical restraint of a patient in order to prevent property damage and "possible" harm to the patient. As previously stated, the parties agree that applicable standard of care permits the use of physical restraint only when the circumstances indicate that there is a risk of imminent harm to the patient or others. If a possible risk of harm justified the use of physical restraint, patients like Nick would be subject to physical restraint for every angry outburst. We find Baskerville's testimony inconsistent with both the applicable standard of care and the conclusion reached by the Court of Claims.

{¶ 35} Following Baskerville's cross-examination, appellee's trial counsel engaged in the following colloquy with Baskerville in an effort to rehabilitate the witness:

> Q. So was that your judgement - - that if you had not applied the bear hug, he was going to continue to destroy property?
>
> A. *Yes, and possibly and harm himself through the destruction of property.*
>
> Q. And did you see the one instance in which [Nick] threw a chair in the direction of one resident?
>
> A. Yes.
>
> Q. Okay. Now, Although he threw that chair, it did not strike or hit the resident, but nonetheless, it was certainly thrown in the direction of the resident.
>
> Is that true?
>
> A. Yes.
>
> Q. Would that be a concern that you would have had because he did that?
>
> A. Yes. Throwing chairs or heavy objects towards individuals is definitely clear and imminent danger that he is no longer in regard of anybody else's health or safety.

(Emphasis added.)  (Dionte Baskerville Trial Dep. at 83.)

{¶ 36} Once again, Baskerville used the word "possibly" in assessing the risk of harm created by Nick's conduct just prior to the time he unsuccessfully attempted to apply the bear hug technique.  Though Baskerville also agreed with counsel that "[t]hrowing chairs or heavy objects towards individuals is definitely clear and imminent danger," the video does not show that Nick was in the process of throwing a chair when Baskerville unsuccessfully attempted to apply the bear hug technique.  (Dionte Baskerville Trial Dep. at 83.)  Moreover, as Aown discussed during her testimony, the video does not show that Nick threw a chair directly at Baskerville or anyone else during the incident.[3]

---

[3]When appellant's trial counsel turned his questions to the second and final attempt by Baskerville to subdue Nick, the following exchange took place:
"Q. (By Mr. Tor): All right. So at this point - - we're at 1:15 and 47 seconds - - it looks like Nick has broken free of the table and of your grip.
Is that right?
A. Yeah.
Q. And is it at this point that you're going to attempt to reapply the bear hug?
A. Uh, yes.
Q. Okay. Just going to switch camera angles and then I'm going to keep playing here.
(Video playing.)
Q. (By Mr. Tor): And now, 1:15 and 50 seconds, the two of you are on the ground.

{¶ 37} We note that appellee has argued, alternatively, even if Nick's behavior on June 24, 2018 did not create a risk of imminent harm to himself or others, Nick's plan permitted WDC staff to employ physical restraint in order to prevent Nick from damaging personal property. We do not read Nick's plan as appellee does. Under the heading "physical aggression" the plan lists "kicking, hitting, punching, throwing/breaking items, destroying property and biting" as instances when physical restraint may be used, but only where Nick's behavior creates an "imminent risk to health and safety." (My Individual Plan, Pl.'s Ex., at 17.) In our view, Nick's plan does not permit the use of physical restraint merely to prevent destruction of property. Therefore, appellee's alternative argument is unavailing.

{¶ 38} Appellee called on Singer to provide testimony as to the standard of care and breach. Singer was initially called as a witness in appellant's case in chief, examined by both parties, and then recalled in appellee's case in chief where he was further examined by both parties. Singer testified that he began his career as a social worker with WDC in 1988. Singer's current employment with WDC is in the position of Qualified Intellectual Disability Professional ("QIDP"). Singer testified that he indirectly supervises the TPW staff at WDC. He testified that he is familiar with the role of TPWs at WDC, and that all TPWs at WDC participate in an orientation which includes intervention training. He added that all TPWs attend yearly retraining.

{¶ 39} Singer was aware that physical and chemical restraints had been used in Nick's case at other facilities, and that both types of restraints were included in Nick's plan at WDC. According to Singer, he successfully used the bear hug technique on Nick after Nick had become agitated during a session with the psychiatrist. Singer also recalled that a form of physical restraint had been successfully performed on Nick by two TPWs working in unison. He was also aware that Nick was overweight and that he had other underlying medical conditions.

{¶ 40} According to Singer, the applicable standard of care at WDC is that physical restraint may be used only when the patients conduct evidences a risk of imminent harm to the patient or others. Singer provided several examples of patient behavior that would

---

Correct?
A. Correct."
(Dionte Baskerville's Trial Dep. at 66-67.)

create a risk of imminent harm including a patient who ties strings around their neck, brandishes silverware in a threatening manner, or strikes a staff member with a fist. Singer stated that TPW staff should employ physical restraint only if it can be performed safely, and he acknowledged that on June 24, 2018 Nick outweighed Baskerville by more than 100 pounds.

{¶ 41} On cross-examination, Singer stated that the use of physical restraint to prevent property damage is inconsistent with WDC policy.[4] Singer recalled that physical restraint was added to Nick's plan following an incident where two TPWs jointly used physical restraint to subdue Nick without causing injury.

{¶ 42} During direct examination by appellee's counsel, Singer was asked about Baskerville's decision to initiate the bear hug hold:

> Q. Do you agree with Dionte Baskerville's decision, based only on your observations as you said because you couldn't hear what was going on and you weren't in the situation at the time. But just on your observations of watching the video and your experience, do you agree with Mr. Baskerville's decision to implement a hold at that point?
>
> A. I did. I felt like he implemented the hold exactly when I would have.

(Mar. 17, 2021 Excerpted Trial Testimony of Daniel Singer at 27-28.)

{¶ 43} Appellant's counsel then asked Singer about Baskerville's second attempt to employ the bear hug after the first attempt had failed. The following exchange took place:

> Q. Now, you told me on Monday that if a restraint technique is not successful and the TPW can't control the resident, the TPW should release the hold, correct?
>
> A. That's correct.
>
> Q. And we saw on the video that Mr. Baskerville could not successfully maintain the bear hug technique when he was up against the table with Nick, correct?
>
> A. He appeared to be struggling with it, yes, that's correct.
>
> * * *

---

[4] After being recalled to the stand in appellee's case in chief, Daniel described the risk associated with the mere destruction of property as follows: "Property destruction isn't bad, depending on what's done. If you're throwing stuff, you're venting, you're letting off steam, we'll let people tend to do that. If those objects start to fly towards someone else that could hurt them or if they're breakable or could snap in half and a piece fly off or something like that, then, no, then I would consider that time to move in and put a stop to that with a safe restraint. You know, that's why we have them in plans." (Excerpted Trial Testimony of Daniel Singer at 23.)

Q. And the appropriate thing to do at that point would have been to release the hold and to take a step back and reassess the situation- -

A. Reassess whether - -

Q. -- correct?

A. -- he still needed it or not, yes.

(Excerpted Trial Testimony of Daniel Singer at 41-42.)

{¶ 44} In appellant's case in chief, appellant's trial counsel asked Singer about Baskerville's second attempt to employ the bear hug after the first attempt had failed. The following exchange took place:

Q. And based on what you observed in the video, you would've wanted Mr. Baskervil[l]e to regroup, reassess and go back to calming Mr. -- to calming Nick without resulting to physical restraints, correct?

A. That's correct, from what he could observe.

(Mar. 15, 2021 Excerpts from Trial Proceedings at 38.)

{¶ 45} Even though Singer testified that Baskerville initially attempted the bear hug "exactly when I would have," Singer opined that Nick managed to break free from the initial hold that Baskerville applied. Singer further stated that Baskerville should have released Nick when he broke free and reassessed whether a second attempt at manual physical restraint was needed or if other calming techniques were more appropriate. The videotape clearly shows that Baskerville did not release Nick and reassess before attempting the bear hug a second time.

{¶ 46} Patricia Nixon was called as a witness by appellee. She is the Superintendent at WDC, a position she likened to a Chief Executive Officer of a corporation. Nixon obtained a bachelor's degree from Bowling Green University and certification as a special education teacher. Nixon testified that she has worked in the field of developmental disabilities in a number of capacities, including TPW, Residential Home Manager, and a position similar to Singer's as a QIDP. Over appellant's objection, the Court of Claims permitted Nixon to testify in the form of an opinion. In response to a lengthy query by the court, Nixon offered her opinion that, based on her review of the videotape, Baskerville acted reasonably in regard to the incident with Nick on June 24, 2018.

{¶ 47} The Court of Claims made the following ruling on appellant's negligence claim:

The security video shows that Nick threw multiple objects at Baskerville or, in the vicinity of Baskerville, <u>before</u> Baskerville physically intervened. Because the video lacks audio, the video the video by itself does not fully depict the totality of the circumstances (e.g., what verbal threats, if any, [Nick] may have made despite the staff's attempt to deescalate the situation), which, in turn, implicates whether Baskerville reasonably and honestly believed that Nick Starling's actions constituted an imminent threat of safety to [Nick], Baskerville, or others to warrant the use of physical restraint. Notably, Baskerville acknowledged—and the video shows— that Nick's erratic behavior persisted, despite staff's attempts to calm Nick. (Baskerville Deposition, 78-79.) And, in Baskerville's view, he had tried every other avenue of deescalating the situation before he chose to use physical restraint. (Baskerville deposition, 64.)

After weighing the submitted evidence, as well as the credibility of the witnesses, the Court finds that Dionte Baskerville had reasonable grounds to believe that Nick Starling's actions constituted an imminent threat of safety to [Nick] Starling, Baskerville or others based on Baskerville's knowledge of Nick Starling and the conditions at the time that Baskerville decided to use physical restraint. The Court determines that, based on the submitted evidence, Cynthia Starling has not proven by a preponderance of the evidence that WDC should be held liable based on a claim of negligence as to Baskerville's physical restraint of Nick Starling.

(June 1, 2021 Decision at 8-9.)

{¶ 48} The Court of Claims focused solely on the question whether Nick's conduct on June 24, 2018 created a risk of imminent harm to himself or others. The court concluded that because "Baskerville reasonably and honestly believed that Nick Starling's actions constituted an imminent threat of safety to [Nick] Starling, Baskerville, or others," appellant had not proven negligence by the preponderance of the evidence. (June 1, 2021 Decision at 8.) The Court of Claims relied on Baskerville's testimony to support this conclusion.

{¶ 49} As earlier noted, however, Baskerville's testimony belies such a finding as Baskerville admitted that just four seconds prior to applying the bear hug, Nick's conduct did not justify the use of physical restraint. Baskerville maintained that he initiated the bear hug technique to prevent further damage to property and "possibly" harm himself.

(Dionte Baskerville Trial Dep. at 64 and 83.) Thus, Baskerville's testimony does not support the conclusion reached by the Court of Claims.

{¶ 50} Even if we were to agree the evidence permitted the conclusion that a risk or imminent harm to Nick or another existed when Baskerville initially attempted to apply the bear hug, Aown testified that the applicable standard of care required Baskerville to release Nick, reassess the situation, confer with fellow TPW Bailey, and partner with Bailey to determine the next appropriate steps. Singer agreed that Baskerville should have released Nick after the first attempt failed and reassessed whether physical restraint was necessary. Our review of the videotape reveals that as Nick managed to break free of Baskerville's hold around his arms, Baskerville continued to wrap his arms around Nick's waist as Nick raised himself up and began to move away from the table. In fact, the video shows that Baskerville, rather than letting go of Nick's waist and reassessing, held onto Nick's waist from behind as Nick struggled to move forward. At that point, Baskerville was essentially hanging on Nick's waist from behind for several feet before the two men fell awkwardly to the ground with Baskerville on top of Nick. Baskerville's continued effort to hold on to Nick's waist from behind as Nick struggled to move several feet forward, in the opinion of this court, more closely resembled a tackle than an attempt to safely apply the bear hug technique, as it was described by the witnesses. Singer agreed that Baskerville struggled to control Nick, who was a much larger man with a substantially greater girth, and Nick broke free of Baskerville's initial attempt to apply the bear hug. At that point, TPW Bailey was nearby and further assistance had been summoned.

{¶ 51} In finding for appellee, the court acknowledged that the videotape, Plaintiff's Exhibit 9, lacked audio, yet the court found that oral threats Nick may have made during the incident supported a finding that physical restraint was required in order to deescalate the situation. When Baskerville was asked, what Nick was saying to him during the incident, however, Baskerville responded that he could not remember. (Dionte Baskerville Trial Dep. at 59.) Moreover, Nick's plan forbids the use of physical restraint in cases of "verbal aggression" such as "cursing, yelling, making threats, etc." (My Individual Plan, Pl.'s Ex., at 18.)

{¶ 52} The function of this court in conducting a manifest weight in a civil case is to determine whether the greater amount of credible evidence supports the verdict. *Eastley* at ¶ 12. Based on our review of the entire record, weighing all the evidence admitted at trial,

and considering the credibility of witnesses, we find that the judgment of the Court of Claims is against the manifest weight of the evidence. In our view, the witnesses' trial testimonies and the videotape of the incident leave no doubt that appellee breached the applicable standard of care when Baskerville injured Nick during an unsuccessful attempt to physically restrain him, and that appellee's negligence proximately caused harm to appellant. Accordingly, we sustain appellant's first assignment of error.

{¶ 53} App.R. 12(C) provides as follows:

> In any civil action or proceeding that was tried to the trial court without the intervention of a jury, and when upon appeal a majority of the judges hearing the appeal find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and have not found any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings.

{¶ 54} Having determined that the judgment in appellee's favor on the negligence claim is against the manifest weight of the evidence, we shall reverse the judgment of the Court of Claims on the negligence claim and remand the matter for the court to enter judgment for appellant on the negligence claim and proceed to a determination of damages.

**2. Second Assignment of Error**

{¶ 55} In appellant's second assignment of error, appellant contends that the court's ruling in favor of appellee as to the battery claim was against the manifest weight of the evidence. We disagree.

{¶ 56} A person is subject to liability for battery when he acts *intending to cause a harmful or offensive contact*, and when a harmful contact results. *Love v. Port Clinton*, 37 Ohio St.3d 98, 99 (1988), citing Restatement of the Law 2d, Torts, Section 13 (1965). The Supreme Court of Ohio has explained that "[c]ontact which is offensive to a reasonable sense of personal dignity is offensive contact." *Love* at 99, citing Restatement of the Law 2d, Torts, Section 19, at 35 (1965). The *Love* court found that the act of subduing another

is an "act[] of intentional contact which, *unless privileged*, constitute[s] a battery." (Emphasis added.) *Love* at 99.

{¶ 57} Privilege denotes conduct which, under ordinary circumstances, would subject the actor to liability, under particular circumstances does not subject him to such liability. *Schultz v. Elm Beverage Shoppe*, 40 Ohio St.3d 326, 327 (1988), adopting 1 Restatement of the Law 2d, Torts, Section 10(1) at 17 (1965). "A privilege may be based upon (a) the consent of the other affected by the actor's conduct, or (b) the fact that its exercise is necessary for the protection of some interest of the actor or of the public which is of such importance as to justify the harm caused or threatened by its exercise." 1 Restatement of the Law 2d, Torts, Section 10(2) (1965).

{¶ 58} Here, the evidence shows that Baskerville, as a TPW employed by WDC, had appellant's consent to use physical restraint techniques to manage Nick's violent outbursts under appropriate circumstances. Even though we have determined that Baskerville was mistaken in his belief that such circumstances existed on June 24, 2018, the weight of the evidence establishes that Baskerville did not apply the bear hug on June 24, 2018, either with the intent to cause harmful offensive contact or to place Nick in fear of harm. Accordingly, the weight of the evidence supports the decision of the Court of Claims as to the battery claim, and we overrule appellant's second assignment of error.

## V. CONCLUSION

{¶ 59} Having sustained appellant's first assignment of error, but overruled appellant's second assignment of error, we affirm the judgment of the Court of Claims of Ohio, in part, and reverse in part. This case is remanded to the Court of Claims to enter judgment for appellant on the negligence claim and proceed to a determination of damages.

*Judgment affirmed in part, reversed in part, and cause remanded.*

LUPER SCHUSTER, P.J., concurs.
DORRIAN, J., concurs in part and dissents in part.

DORRIAN, J., concurring in part and dissenting in part.

{¶ 60} I concur with the majority's decision to overrule the second assignment of error and affirm the Court of Claims' decision finding appellant has not proven by a preponderance of the evidence the battery claim.

{¶ 61} I respectfully dissent, however, from the majority's decision to: (1) sustain the first assignment of error and reverse the Court of Claims' decision finding appellant has not proven by a preponderance of the evidence the negligence claim as to Baskerville's physical restraint of Nick, and (2) instruct the Court of Claims on remand to enter judgment in favor of appellant on the same claim rather than remand for a new trial.

{¶ 62} I would find that the Court of Claims' finding against appellant's negligence claim was not against the manifest weight of the evidence, taking into consideration plaintiff's exhibit 9 (videos) and the testimony presented.

{¶ 63} Plaintiff's Exhibit 9 contains several videos of different angles depicting four spaces at WDC.

{¶ 64} The Cott 8 # 301 video reveals Nick enter a reception area which is adjacent to the dining room area. At approximately 1:06 in the videotape, Nick takes a folder or paper to look at. He then sits at a table. A TPW picks up a book or folder and begins reviewing it. At approximately 1:08, Nick approaches and tries to take the book from the TPW. Baskerville enters and appears to remain calm. Nick attempts to take the book again and points his finger at the TPW and Baskerville. At approximately 1:11, Nick leaves the reception area, walks through the dining room and departs through a door.

{¶ 65} The Cott 8 # 20 Service Entrance Hallway video reveals that at approximately 1:11, Nick enters the hallway followed by Baskerville. Nick walks to the end of the hallway, and Baskerville stands in front of the door at the end of the hallway so Nick cannot exit through that door. Baskerville appears calm and does not touch Nick. Nick reaches out to slap or punch Baskerville in the chest, and Baskerville raises his own arm in response to deflect the slap or punch. Nick backs up and aggressively points his finger at Baskerville. Baskerville appears calm and steps back. Nick walks the other direction away from Baskerville. Another TPW enters the hallway. At approximately 1:12, Nick exits the hallway through the same door he entered and Baskerville and the other TPW calmly follow.

{¶ 66} The Cott 8 # 301 video reveals that at approximately 1:12, Nick returns to the dining room. The video shows Nick go behind a wall. From this video, Nick is not visible behind the wall, however Baskerville is visible standing back, hands in his pockets, appearing calm, watching Nick.

{¶ 67} The Cott 8 # 16 – 8100 South Entertainment Room video reveals the area behind the wall that is not visible from the videos depicting the dining room and reception

area. The area has two sofas, two chairs, three tables, and shelving with items on top. At approximately 1:12:12, Nick enters the area and immediately begins shoving items off the shelves. Baskerville is following behind. Baskerville catches up to Nick behind the wall and then backs away. He does not touch Nick. Nick is throwing books, binders, and papers across the room. At 1:12:29, Baskerville exits the room on the other side. Nick remains in the room and continues throwing what appear to be games and more papers and books off the shelves. At approximately 1:12:50, Baskerville can be seen standing outside the room watching Nick. At 1:13:07, Nick throws a book at Baskerville. Baskerville steps to the left to avoid being hit. Nick immediately throws another book at Baskerville. Baskerville again pivots to avoid being hit. They appear to exchange words. Nick throws cards in Baskerville's direction. At approximately 1:13:32, Nick leaves the room from the opposite side where Baskerville is standing.

{¶ 68} The Cott 8 # 1 8100 Dining Room video shows the dining room and reception area from a different angle than the Cott 8 # 301 video. It reveals that when Nick emerges from the hallway and re-enters the dining room, he pushes a large trashcan to the floor before going behind the wall to the south entertainment room. Baskerville follows Nick behind the wall but emerges from the other side within seconds and takes a step back to watch Nick. Nick is throwing things behind the wall and other items from behind the wall into the dining room area. Baskerville and the other TPW calmly watch from the dining room area. Nick throws what appears to be a tray and book in the direction of Baskerville causing Baskerville to take a step and pivot to avoid being hit. Nick emerges from the other side of the wall into the dining room. A third TPW escorts another resident away from the direction Nick is headed and ultimately around the corner so as to shield the resident. Baskerville is seen across the room watching Nick and then calmly approaching. Nick continues to throw what appears to be papers into the dining room and reception area. Baskerville watches. Nick kicks something and then, at approximately 1:14:35, Nick picks up a chair and throws it in the direction of Baskerville and directly in the path of the third TPW. The third TPW runs away to avoid being hit. Nick walks and Baskerville follows. At approximately 1:14:52, Nick shoves a toaster off a table. The video partially reveals the resident who was around the corner moving to leave the area. Nick walks and Baskerville follows. At 1:15:04, Nick picks up two flower pots off a dresser and throws them to the ground. At this point it appears that Baskerville, who is following Nick from behind, raises

his arms but then lowers them and backs up. He continues to follow Nick. Nick throws papers at Baskerville's face at close range at 1:15:16. At 1:15:19, Baskerville attempts the bear hug and wraps his arms around Nick's arms. Nick resists and with Baskerville clinging to him walks forward a couple steps and at 1:15:22 Nick then turns to his right and leans over a table. Baskerville still has his arms wrapped around Nick's arms and is leaning over Nick. One of Nick's legs is between Baskerville's legs. From 1:15:22 to 1:15:45, the video shows Baskerville maintaining the bear hug as Nick resists, then appears to calm, then resists again. In this attempt at resisting, Nick tries to pull his leg out from between Baskerville and Baskerville appears to try to maintain his footing as Nick ultimately succeeds in raising himself up with Baskerville on his back. At approximately 1:15:47, in what appears to be continuous motion of Nick struggling and lifting himself up and Baskerville attempting to maintain the bear hug, Nick succeeds in freeing his arms and Baskerville's arms end up under Nick's arms yet still wrapped around his chest. Nick attempts to flee with Baskerville still embracing him from behind. At 1:15:49, Nick appears to lift his left leg high and then Nick and Baskerville fall to the floor. Baskerville immediately gets up, and Nick remains on the ground laying on his stomach with his arms underneath his head. Baskerville backs away. At 1:16, the third TPW begins removing chairs from the area where Nick is lying on the floor. At 1:18:30, Nick attempts to get up, but stumbles to the ground after appearing to put weight on his leg. He sits and holds his right leg. A fourth TPW examines Nick's leg.

{¶ 69} The Cott 8 # 21 8100 Dining Room video shows the dining room and reception area from yet another angle. It reveals that when Nick throws the chair directly in the path of the third TPW, she runs and appears to shield and extend her hand to move the resident whom she had previously escorted away and around the corner. The resident remains seated and the third TPW sticks close by. As Nick continues walking around the room and closer to where the resident is sitting, the third TPW pulls the resident in his chair away from Nick approaching and the resident gets up and walks with the third TPW behind a wall.

{¶ 70} The majority focuses its analysis on Baskerville's testimony that he employed the bear hug to prevent Nick from continuing to destroy property and from "possibly" harming himself. Notwithstanding Baskerville's concern for destruction of property and use of the term "possible" when referring to harm to Nick himself, Baskerville also testified

he was trying "to halt the entire situation, attempt to deescalate the situation." (Baskerville Depo. at 63-64.) Baskerville additionally stated that "[t]hrowing chairs or heavy objects towards individuals is definitely clear and imminent danger that he is no longer in regard of anybody else's health or safety." (Baskerville Depo. at 83.) The policy permitted use of the bear hug technique when Nick engaged in behavior that represented a risk of imminent harm not only to himself, but also to others.

{¶ 71} The majority also focuses its analysis only on the four seconds prior to when Baskerville initiated the bear hug. However, the videos depict seven minutes of escalating behavior. During these seven minutes, Nick struck Baskerville in the chest, threw a tray and book at Baskerville, threw a chair in the direction of Baskerville and directly in the path of a third TPW who ran away to avoid being struck. The same TPW, assessing the escalating situation, escorted another resident, not once, but twice, away from the vicinity of Nick and behind a corner and then a wall. One second before the majority begins its analysis, at 1:15:16, Nick aggressively threw papers in Baskerville's face at close range. The videos support Baskerville's testimony and the Court of Claims' conclusion that Nick's behavior was escalating and was a clear and imminent danger to others health and safety.

{¶ 72} The majority also refers to Baskerville attempting a "second" bear hug, but the videos appear to depict a continuous motion of Baskerville initiating one bear hug and attempting to maintain the same bear hug, rather than two separately initiated bear hugs. (Majority opinion at ¶ 8, 26, 43-45, and fn. 3.) Furthermore, the initiation of the bear hug began at 1:15:19; Nick resisted, calmed and resisted again from 1:15:19-1:15:45; Nick freed his arms with Baskerville attempting to maintain the bear hug ending up with his arms under Nick's arms; Nick and Baskerville fell to the floor at 1:15:49. This all happened in less than 1 minute—in approximately 30 seconds. Nick freed his arms at approximately 1:15:47 and 2 seconds later, at 1:15:49, Nick and Baskerville fell to the ground.

{¶ 73} In support of its conclusion that Baskerville should have backed off the bear hug and reassessed before attempting a second bear hug, the majority quotes excerpts of Singer's testimony on cross-examination. The majority also states that Singer opined "Nick managed to break free from the initial hold that Baskerville applied. Singer further stated that Baskerville should have released Nick when he broke free and reassessed whether a second attempt at manual physical restraint was needed or if other calming techniques were more appropriate." (Majority opinion at ¶ 45.) But the testimony of Singer was that

generally a TPW who executes a restraint technique that is not successful should release the hold and reassess. Singer conceded that from the video Baskerville appeared to be struggling with the hold, but he did not agree that Baskerville could not safely execute the single bear hug technique, but, rather, stated "[i]f that was [Baskerville's] testimony, that would be his judgment call." (Singer Depo. at 41.) Singer qualified this same testimony by stating it would be Baskerville's judgment call as to whether he could not safely execute the single bear hug technique. Singer testified "[t]hat was [Baskerville's] judgment call. If the call [for additional help] had been made and he was aware of it and he felt he could do that, he would do that. If he felt he needed to maintain the hold to keep Nick or others safe, he wouldn't maintain the hold. * * * That's a judgment call that he has to make as far as reimplementing or not." (Singer Depo. at 42.)

{¶ 74} Singer also described his experience in executing holds:

> Holds are uncomfortable for everyone. There's a lot going on. Emotionally usually people are upset. Physically they don't want to be -- you know, have someone have hands on them. There's a lot going through the staff person's mind. Again, you train ahold, and it's one thing to practice it. I've been in holds - - one of the more recent ones I was in, the guy had no pants on, and I was restraining his legs, and his penis was about four inches from my face, and this guy had a history of urinating on people. Those things run through your mind, but you're still trying to keep them safe while you're doing it. There's an awful lot going on when you are making the judgment decisions. And you make mistakes and incorrect decisions at times with best effort. You're just hoping that, you know, you're going to keep getting that person through that situation.
>
> Q. And when you're in that situation, how long do you have to make judgment calls when you're in the situation?
>
> A. It's really quick. It's instantaneous most of the time.

(Singer Depo. at 47-48.)

{¶ 75} This is a difficult case. However, considering the aforementioned evidence, I cannot say the Court of Claims clearly lost its way in finding appellant has not proven by a preponderance of the evidence the negligence claim. For these reasons, I respectfully dissent from the majority's sustaining of the first assignment of error and reversing the Court of Claims' judgment in favor of appellee on the negligence claim.

{¶ 76} I also dissent from the majority's instructing the Court of Claims on remand to enter judgment for appellant on the negligence claim. First, I would remand for a new trial on all the elements. Second, the Court of Claims did not address the proximate cause element of the negligence claim. The court weighed the evidence and entered judgment based only on the first two elements of negligence: (1) duty, and (2) breach of duty. Because the Court of Claims found a preponderance of the evidence did not support the breach of duty element, it did not address the third element: (3) whether the breach of duty was the proximate cause of the injury. The majority analyzes the Court of Claims' finding that a duty existed and that the duty was breached. The majority does not analyze the evidence regarding proximate cause, yet instructs the Court of Claims to enter judgment in favor of appellant. Notwithstanding my dissent from the majority's decision to reverse the court's finding as to duty and breach of duty, I encourage the majority to remand the case for a new trial before the Court of Claims rather than entering judgment in favor of appellant.

_____