[Cite as *State v. R.S.M.*, 2023-Ohio-4288.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 22AP-323 |
| v. | : | (C.P.C. No. 20CR-2583) |
| [R.S.M.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 21, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Michael A. Walsh*, for appellee.

**On brief:** *Yeura R. Venters*, Public Defender, and *Leon J. Sinoff*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant, R.S.M., appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, pursuant to a jury trial that found him guilty of one count of assault, a misdemeanor of the first degree, and one count of domestic violence, a felony of the fourth degree.

**I. Facts and Procedural History**

{¶ 2} On June 15, 2020, appellant was indicted on two counts of domestic violence in violation of R.C. 2919.25, both charged as felonies of the fourth degree. In Count 1, prosecutors indicted appellant for domestic violence involving M.V., his girlfriend at the time. Before trial, however, prosecutors agreed to amend Count 1 from domestic violence to the lesser-included offense of assault, a misdemeanor of the first degree. In Count 2, prosecutors indicted appellant for domestic violence involving M.M., appellant's

biological daughter. The record reveals that, on February 19, 2009, the Franklin County Municipal Court sentenced appellant to a suspended jail term of 90 days and 2 years of community control after he pled guilty to attempted assault pursuant to R.C. 2923.02 and 2903.13. The parties stipulated to appellant's prior conviction for attempted assault involving a family or household member. The present charges arose from a violent dispute in appellant's home in the early morning hours of May 20, 2020 involving appellant, M.V., and M.M. Appellant pled not guilty, and the matter proceeded to trial by jury. The following evidence was presented at trial.

{¶ 3} In May 2020, appellant resided on Vanderberg Avenue in the Hilltop neighborhood of Columbus, Ohio. Appellant shared custody of his two biological children, one of which was M.M. M.V. and appellant had been dating for nearly two months prior to May 20, 2020, and M.V. was staying over at appellant's house for the night. Five children were present in the house at the time of the domestic violence incident: appellant's two biological children, appellant's stepdaughter, and M.V.'s two children.

{¶ 4} Appellant learned on May 19, 2020 that his grandmother had passed away. Upon learning of her death, appellant was "pretty upset" because he had a "pretty close connection with her." (Tr. Vol. III at 13.) Appellant spent part of that day meeting with family to discuss funeral arrangements and other matters pertaining to the death of his grandmother. When appellant came home, he and M.V. went to the grocery store to pick up supplies to make ice cream sundaes with the children. Appellant also bought a bottle of absinthe.

{¶ 5} At this point, the testimony of M.V. and appellant began to diverge. M.V. claimed that upon returning from the grocery store, appellant started "drinking out of the bottle" of absinthe, "and he was getting a little drunk." (Tr. Vol. II at 35.) She testified he was "chugging out of the bottle." (Tr. Vol. II at 35.) M.M. in her testimony corroborated M.V.'s claim that appellant was drinking straight from the bottle and was acting "tipsy and wobbly." (Tr. Vol. II at 150.) M.V. recounted appellant then left the home to smoke a cigarette and shortly thereafter she heard appellant's motorcycle start up by the garage outside. M.V. described the conditions outside as "all the way dark" and "raining." (Tr. Vol. II at 37.) According to M.V., she had never taken appellant's motorcycle out before because it had "a bunch of things wrong with it." (Tr. Vol. II at 37.) M.V. did not think it

was a good idea for appellant to take the motorcycle out because "he was a little bit inebriated," it was raining, and the motorcycle was not in good riding condition. (Tr. Vol. II at 38.) Due to her worry that appellant would "hurt[] himself or * * * hurt[] somebody else," M.V. tried to convince appellant to stay home instead, but he was "adamant" and went out for a ride. (Tr. Vol. II at 38.)

{¶ 6} Appellant, on the other hand, claimed M.V. was the first one to take a drink after they returned from the grocery store. He testified he poured two shots of absinthe, one for M.V. and one for himself. According to appellant, M.V. took the shot, but because he "was already upset, emotional," he "decided not to take the shot and left." (Tr. Vol. III at 14.) Appellant later testified he had actually refilled M.V.'s shot glass with absinthe before leaving, so the two shot glasses sat out until he returned from his motorcycle ride. In contrast to M.V.'s testimony that it was raining, appellant stated although "it had been raining previously, * * * it was not raining." (Tr. Vol. III at 15.) He also testified, again contrary to M.V.'s testimony that it was completely dark outside, "[t]he sun was going down. It was starting to get dark out." (Tr. Vol. III at 15.) From video evidence in the record, appellant was outside starting up his motorcycle at approximately 9:01 p.m. Appellant claimed M.V. tried to stop him "[m]ultiple times" by getting in his way and "blocking the entrance to the hallway to get out." (Tr. Vol. III at 18.) Appellant "walked around" M.V. and went for a ride, returning at approximately 9:28 p.m. (Tr. Vol. III at 18.)

{¶ 7} When appellant returned from his motorcycle ride, M.V. claimed "the alcohol had fully kicked in" and he was now "drunk." (Tr. Vol. II at 39.) M.V. recounted how appellant tried to use the restroom but instead fell "inside the tub," prompting her to "pick him up out of the tub." (Tr. Vol. II at 39.) Around the same time, appellant was repeatedly "swigging out of the bottle" of absinthe, rebuffing M.V.'s attempts to curb his drinking. (Tr. Vol. II at 39.) Although appellant claimed he drank two shots of absinthe upon returning from his ride, and that those were the first drinks he had that evening, he also admitted the absinthe "was very strong" and "hit [him] pretty fast." (Tr. Vol. III at 22-23.)

{¶ 8} Appellant testified he forgot to close the back gate when he returned home and noticed a husky had followed him into the backyard. Appellant said he went outside and, confirming the dog was wearing a collar and tag, let the husky into the home.

According to M.V., appellant then let his own dog, a "pit mix of some sort," out of its cage over M.V.'s protestations, resulting in a "ruckus" with the two dogs fighting each other. (Tr. Vol. II at 40, 41.) After initially moving her children away from the fighting, the dogs were separated and M.V. put the husky outside. M.V. stated appellant then began crying and yelling about his grandmother and "just going off like that. He was drunk." (Tr. Vol. II at 42.) M.V. claimed appellant, upset about the husky being put outside, ventured outside on foot without notifying M.V. or any of the children. Both M.V. and appellant's daughter worried where appellant had gone and attempted to call his cell phone numerous times, but he did not answer.

{¶ 9} When appellant returned to the house, M.V. said he was "super angry," "super drunk," "stumbling around the house," and "yelling obscenities." (Tr. Vol. II at 43.) M.V. claimed appellant was alternating between yelling at her to leave the house and pleading with her to stay. Appellant confirmed in his testimony that at some point, he told her to "get out," and at another other point he told her if she loves him, she could come back. (Tr. Vol. III at 32.) At one point, she decided to leave with her two children. When she walked out the door, appellant said he "started crying" and "punch[ed] the wall as soon as she le[ft]," breaking his hand. (Tr. Vol. III at 26.) M.M. testified that after M.V. left, she and her siblings were "scared because [appellant] was drinking." (Tr. Vol. II at 154.) M.V. brought her children to the car, but upon reentering to grab her cell phone charger, she saw appellant lying face down in the hallway, "sobbing," with two of his children "trying to wipe his face." (Tr. Vol. II at 47.) M.V. decided against leaving appellant's children alone with him, so she attempted to get appellant and the children to bed.

{¶ 10} M.V. testified that she and appellant walked into the bedroom and appellant immediately closed and locked the door, took off all his clothes, and got into bed. In contrast, appellant claimed he "think[s]" M.V. locked the door, but he is "not a hundred percent sure." (Tr. Vol. III at 33.) Appellant said he "think[s]" he was lying in bed, arguing with M.V., and he could not recall whether he was wearing any underwear. (Tr. Vol. III at 34.) He also stated he did not "think [he] had any clothes on." (Tr. Vol. III at 34.) Appellant testified he asked M.V. to leave the bedroom multiple times, but she refused and in fact blocked his exit from the bedroom. In M.V.'s telling, appellant began violently grabbing M.V. in an effort to initiate sex; he pulled at her, tried to put his hands

around her throat, spit at her, tried to bite her, pulled at her shirt, and pulled her pants around her ankles. She attested that she resisted, which further angered appellant and caused him to begin "destroying the room," including smashing a lamp. (Tr. Vol. II at 51.)

{¶ 11} In appellant's telling, M.V. blocked his exit from the bedroom and threw him against the wall, causing him to "get upset" and "yell at her to get the f*** out." (Tr. Vol. III at 35.) Appellant admitted he smashed the lamp against the wall because he was "frustrated" and "felt like [he] was going to get attacked by [M.V.]." (Tr. Vol. III at 35.) He said he "tried to walk out of the bedroom door again," but M.V. grabbed him and threw him down onto the bed, holding him down. (Tr. Vol. III at 35.) Appellant described the ensuing struggle as "a wrestling match" in which he tried to get her off him and exit the bedroom. (Tr. Vol. III at 36.) Appellant claimed he did not pull M.V.'s pants off, but rather that "[s]he pulled her own pants off." (Tr. Vol. III at 34.) Appellant testified that M.V. stuck "her head out the door and talk[ed] to [M.M.] and sa[id] call 911, call 911" after M.M. had yelled from outside of the door that she was going to call the police. (Tr. Vol. III at 36.)

{¶ 12} M.V. described this moment differently. She heard the children panicking outside the bedroom door. The children managed to unlock the bedroom door, cracking it open at the same time appellant began "charging" toward the door. (Tr. Vol. II at 53.) M.V., worried appellant might injure the children, blocked appellant and tried to "push him back against the wall." (Tr. Vol. II at 53.) M.V. recalled appellant then pushed her through the closet door. At this time, M.M. entered the room holding a telephone. As the children yelled at the adults to stop, M.V. was able to close the door, leaving only M.M still inside the bedroom with M.V. and appellant. M.M. asked whether she should call the police, and M.V. responded affirmatively.

{¶ 13} M.V. next recalled how appellant charged at her again, but this time she was able to dodge his advance. She stated appellant crashed into a wall mirror, shattering it and falling onto the floor, giving M.M. a chance to escape from the bedroom. Appellant claims he was "pushed" and "shoved," causing him to fall "back into the glass mirror." (Tr. Vol. III at 38.) According to appellant, the children had "already made the assumption before they even came in that [appellant] was the aggressor." (Tr. Vol. III at 40.)

{¶ 14} M.M. recounted how, after M.V. and appellant had gone to the bedroom together, the children were watching TV in the living room. They heard a loud thump, concerning them, and when they heard M.V. scream, all the children "ran back to the back bedroom." (Tr. Vol. II at 155.) While the children knocked and banged on the door, M.V. was "screaming for help." (Tr. Vol. II at 155.) M.M. procured a spare key and successfully unlocked the bedroom door, but only she was able to gain entry because appellant was "pushing on the door, trying to get [the children] out." (Tr. Vol. II at 156.) Once M.M. was inside the bedroom, she saw M.V. up against a wall with appellant "sort of on top of her" and he was "trying to hit" M.V. with his fists. (Tr. Vol. II at 156.) Once M.M. and M.V. got the bedroom door open, M.M. escaped and was instructed by M.V. to call 911. M.M. then grabbed her phone and called 911 "several times." (Tr. Vol. II at 157.)

{¶ 15} Next, appellant testified how he tried to "get [M.M.'s] phone to try to stop her from calling." (Tr. Vol. III at 40.) Appellant said he went searching for M.M. and eventually found her in another bedroom. Thinking she "had the phone in her hand," appellant says he attempted to "grab the phone," but tripped over toys strewn about on the ground and fell "on top of [M.M.]." (Tr. Vol. III at 41.) Appellant relays how he was "sprawled out," "laying down on top of [M.M.], on top of the toy box." (Tr. Vol. III at 42.) He described her position as "laying on the toy box, on her back and up to her neck, and her head up against the wall." (Tr. Vol. III at 42.) Appellant recounted how his young son jumped on top of his head, "screaming." (Tr. Vol. III at 42.) He also said he heard [M.M.] "screaming" at him to get off her. (Tr. Vol. III at 42.) He then recounted M.V. running in, pushing appellant's son off appellant, and holding appellant to the ground while the children ran out of the room. Appellant testified he never had his hands around M.M.'s throat. He assumed the scratch on M.M.'s neck came "from the toys when we fell into them." (Tr. Vol. III at 42.)

{¶ 16} In M.M.'s recollection of this encounter, as she began calling the police, appellant looked at M.M., got up off M.V., and "chas[ed] after [M.M.], screaming at [her]." (Tr. Vol. II at 157.) M.M. thought appellant "looked very angry." (Tr. Vol. II at 157.) M.M. stated she ran into the office, and, knowing appellant was after the phone, threw the phone into a corner of the room. Appellant continued chasing M.M. into the back corner of the room, against the wall. M.M. had her back up against toys with her head on the wall while appellant "put[] his hands around [her] neck" with a "pretty tight grip" on her

neck. (Tr. Vol. II at 159.) M.M. said appellant squeezed her neck "[p]retty hard," and as a result she was "[n]ot really" able to breathe; she felt "nauseous" and "was gasping for air." (Tr. Vol. II at 160.) M.M. believed she "was going to die." (Tr. Vol. II at 161.) Although M.M. said she did not remember what appellant was saying at the time, she remembers he was "screaming." (Tr. Vol. II at 161.) About ten seconds later, M.M.'s brother ran in the room and began "hitting [appellant] repeatedly on his back," causing appellant to momentarily loosen his grip on M.M.'s neck and allowing her to "get a little bit of air." (Tr. Vol. II at 159.) Then, M.M. testified that M.V. came in and "jump[ed] on [appellant's] back," knocking and pinning appellant to the ground. (Tr. Vol. II at 159.) At this point, M.M. and the other children ran outside and went to the neighbor's front door. The children waited in the neighbor's yard until M.V. emerged from the house and put them all inside the car to wait for police to arrive.

{¶ 17} In M.V.'s recounting, appellant chased after M.M. while M.V. stayed behind to put her pants back on. After checking on some of the other children who had gathered in the kitchen, M.V. searched for appellant and M.M. When M.V. found them in another room, she testified she saw appellant had M.M. pinned "against the wall" with both hands "on her throat." (Tr. Vol. II at 55.) M.V. stated M.M. had one hand on appellant's throat while appellant's son was "hitting him, telling him to stop, that he's killing her." (Tr. Vol. II at 55.) M.V. stated M.M. at this point was "not speaking a word," and, with "tears rolling down her eyes," she mouthed the words "help me." (Tr. Vol. II at 55.) M.V. said appellant "was naked on top of [M.M.], choking her out." (Tr. Vol. II at 56.)

{¶ 18} After a slight hesitation due to her disbelief at what she was witnessing, M.V. said she "charged [appellant] and knocked him onto the floor." (Tr. Vol. II at 56.) She held him to the floor and directed the children to go outside; once they were gone, she got off appellant and shut him in the room, where he remained "screaming, crying, [and] wailing" to be let out. (Tr. Vol. II at 56.) Once he fell silent, M.V. recounted running outside, yelling for the children who had gone to the neighbor's yard, and locking them in her car. M.V. then reentered the house to retrieve her cell phone and car keys, where she encountered appellant face down on the bed, "naked, screaming[,] and crying." (Tr. Vol. II at 58.) She then "ran out of the house" and called police again. (Tr. Vol. II at 58.) M.V. testified that she and the children waited in the car for police to arrive. As they waited

in the car, M.V. observed M.M. had marks on her neck and described her demeanor as "really quiet" and "crying." (Tr. Vol. II at 65-66.)

{¶ 19} The state also called as a witness Darrel Kerns, a Columbus police officer who responded to the 911 calls placed from appellant's house that night ("Officer Kerns"). Officer Kerns was on duty with Officer Lucas Metz. When they arrived, Officer Kerns observed M.M. was "visibly upset, shaking, [and] crying" and had "some small scrapes and lacerations" on her neck. (Tr. Vol. II at 131.) Upon entering the home, the officers found appellant "passed out in the bedroom," "fully naked." (Tr. Vol. II at 131, 132.) Officer Kerns observed appellant was highly intoxicated based on his inability to wake up, his unsteadiness on his feet, and the "[s]trong smell of alcohol." (Tr. Vol. II at 132.) The officers attempted to conduct an interview of appellant, but because of his state of intoxication, "the interview just didn't go anywhere." (Tr. Vol. II at 134.) The police interview of M.V. aligned with the testimony she provided to the trial court.

{¶ 20} After witness testimony, the attorneys made closing statements and the trial court submitted the case to the jury. The jury deliberated and found appellant guilty of assault and domestic violence. The jury also found appellant was previously convicted of, or pled guilty to, attempted assault involving a family or household member. After a sentencing hearing, the trial court sentenced appellant to four to six months in the Franklin County Community Based Correctional Facility and four years of community control. Appellant timely appeals.

## II. Assignments of Error

{¶ 21} Appellant presents the following three assignments of error for our review:

> I. By Failing to Require the Jury to Find Beyond a Reasonable Doubt that Defendant's Prior Conviction for Attempted Assault Was an Offense of Violence, the Jury Was Relieved of its Duty to Find Every Essential Element of Count Two, in Violation of [Appellant's] Constitutional Rights.

> II. Defense Counsel's Failure to Properly Cross-Examine [M.V.] on her Prior Inconsistent Statement to Detectives, Which Supported [Appellant's] Defense of Accident as to Count Two, Constituted Ineffective Assistance of Counsel.

> III. Appellant's Convictions Are Against the Manifest Weight of the Evidence.

## III. Analysis

### A. First Assignment of Error

{¶ 22} In his first assignment of error, appellant contends the trial court erred in failing to instruct the jury to find that his prior conviction for attempted assault was an offense of violence.

{¶ 23} Generally, a criminal defendant " ' "is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged." ' " *State v. D.H.*, 10th Dist. No. 16AP-501, 2018-Ohio-559, ¶ 43, quoting *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 98, quoting *State v. Adams*, 62 Ohio St.2d 151, 153 (1980). " '[T]here is a strong presumption in favor of the propriety of jury instructions. Instructions which, in their totality, are sufficiently clear to permit the jury to understand the relevant law shall not be the cause of a reversal upon appeal.' " *State v. Calderon*, 10th Dist. No. 05AP-1151, 2007-Ohio-377, ¶ 54, quoting *Arthur Young & Co. v. Kelly*, 88 Ohio App.3d 343, 350 (10th Dist.1993). "A jury instruction must 'present a correct, pertinent statement of the law that is appropriate to the facts' of the case." *State v. Daniels*, 10th Dist. No. 18AP-626, 2019-Ohio-1791, ¶ 4, quoting *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46. " 'Whether jury instructions correctly state the law is a question of law that an appellate court reviews de novo.' " *D.H.* at ¶ 43, quoting *Calderon* at ¶ 55; *see also Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 22 ("The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review.").

{¶ 24} "On appeal, a party may not assign as error * * * the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). An appellant that fails to object as required by Crim.R. 30(A) waives the issue on appeal absent plain error in the jury instructions. *State v. Huish*, 10th Dist. No. 21AP-255, 2023-Ohio-365, ¶ 55, citing *State v. McCown*, 10th Dist. No. 06AP-153, 2006-Ohio-6040, ¶ 36. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances

and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97 (1978).

{¶ 25} The trial court instructed the jury in the present case as follows:

> If the State proved beyond a reasonable doubt that the defendant is guilty of **Domestic Violence**, you must make an additional factual finding. You must then separately consider whether the State proved beyond a reasonable doubt that the defendant was previously convicted of Attempted Assault involving a victim who was a family or household member, on or about February 19, 2009 in Franklin County Municipal Court.
>
> This evidence was received because a prior conviction is an element of the domestic violence offense charged.

(Emphasis sic.) (Final Jury Instructions at 7-8.) Appellant argues the trial court should have further instructed the jury to determine whether appellant's previous conviction of attempted assault was an offense of violence under R.C. 2919.25(D)(3), as that determination is a prerequisite to enhancing appellant's charge from a misdemeanor to a felony. *See* R.C. 2919.25. Appellant did not object to the jury instructions at trial, so we review this alleged defect in the trial court's jury instructions for plain error. Crim.R. 52(B). Juries, as factfinders, are responsible for assessing the credibility of witnesses and facts presented to them, whereas the trial court in a jury trial is responsible for establishing and explaining to the jury the legal parameters in which the case operates. R.C. 2945.11. Determining whether a criminal offense is an offense of violence pursuant to R.C. 2919.25(D)(3) is a matter of law. *See State v. Johnson*, 5th Dist. No. CT99-0005 (Dec. 2, 1999) ("[W]e find felonious assault is an 'offense of violence' contemplated by R.C. 2923.13. The trial court was entitled to make this determination as a matter of law."). Accordingly, it is the responsibility of the trial court itself rather than the jury to decide whether a defendant's prior conviction was an offense of violence under R.C. 2919.25(D)(3).

{¶ 26} Here, the trial court did not err by omitting this purely legal question from the jury instructions. It properly instructed the jury to determine a factual question— whether appellant was previously convicted of attempted assault. The jury unanimously found appellant was "previously convicted of, or pled guilty to, Attempted Assault involving a victim who was a family or household member on or about February 19, 2009

in Franklin County Municipal Court." (Apr. 7, 2022 Verdict - 2(B) at 2.) Whether appellant's prior conviction for attempted assault is an offense of violence was a statutory question, and the trial court therefore correctly omitted the issue from the jury instructions. We thus find no error, let alone plain error, in the trial court's jury instructions regarding appellant's prior conviction for attempted assault.

{¶ 27} Accordingly, appellant's first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 28} In his second assignment of error, appellant contends he received ineffective assistance of counsel when his defense counsel failed to cross-examine M.V. on a purported prior inconsistent statement she made to detectives before trial.

{¶ 29} In order to compel the reversal of his conviction on grounds of ineffective assistance of counsel, appellant must affirmatively prove his case satisfies a two-part test established by the United States Supreme Court. *See Strickland v. Washington*, 466 U.S. 668, 687-98 (1984). The Supreme Court of Ohio later adopted the *Strickland* test to determine whether an attorney's representation was ineffective. *See State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Only after appellant satisfies both parts of the *Strickland* test may an appellate court resolve whether his conviction "resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland* at 687.

{¶ 30} The first part of the *Strickland* test requires appellant to "show that counsel's performance was deficient." *Id*. at 687. Deficient performance means representation so "objectively unreasonable" that it "deviat[es] from the acceptable range of professionally competent assistance." *Huish* at ¶ 92, citing *Strickland* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland* at 689. Due to the challenges of reviewing an attorney's performance at trial, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id*., quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

{¶ 31} The second part of the *Strickland* test requires appellant to show "the deficient performance prejudiced the defense" and deprived appellant of a fair trial. *Strickland* at 687. Appellant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶ 32} While cross-examining Officer Kerns during trial, appellant's counsel asked about statements purportedly made by M.V. during a police interview. Appellant's counsel asked whether M.V. told Officer Kerns that appellant "had his hands forward and did grab [M.M.] by the neck, but he was so inebriated, he stumbled and fell forward on top of [M.M.]," to which Officer Kerns responded he did not remember any such statement. (Tr. Vol. II at 138.)  The prosecution later clarified the statement referenced by appellant's counsel came from a police interview conducted by Detective Anthony Monturo, so appellant's counsel had mistakenly asked Officer Kerns about a conversation to which he was not privy.  Appellant argues his counsel should have confronted M.V. about her statement to Detective Monturo because, in his mind, it corroborated appellant's testimony and could have changed the outcome of the trial.  But that brief exchange with Officer Kerns was the extent of the evidence adduced at trial regarding M.V.'s police interview with Detective Monturo.  Appellant's counsel did not call Detective Monturo to testify, nor did she ask M.V. about statements she made during that interview.

{¶ 33} The only information available in the record about Detective Monturo's interview of M.V. are the questions posed by counsel to Officer Kerns—and such questioning merely confirms Detective Monturo interviewed M.V. on May 28, 2020.  The record is simply not complete enough to verify anything M.V. allegedly told Detective Monturo.  As such, statements M.V. made could have been either helpful or detrimental to appellant's defense.  Without a more complete record, we simply do not know.  Viewing trial counsel's conduct in a highly deferential light, we cannot say the conduct at issue here was deficient under the *Strickland* standard.  It is entirely possible the decisions not to call Detective Monturo to testify and not to cross-examine M.V. about statements she made during that interview were strategic decisions intended to prevent prejudicial information from reaching the jury. " 'Trial counsel need not cross-examine every witness. The strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment.' " *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 216, quoting *State v. Otte*, 74 Ohio St.3d 555, 565 (1996).  In light of such discretion, "decisions regarding cross-examination * * * do not form the basis for a claim of ineffective assistance of counsel." *State v. Harris*, 10th Dist. No. 09AP-578, 2010-Ohio-1688, ¶ 28,

citing *State v. Flors*, 38 Ohio App.3d 133, 139 (8th Dist.1987), and *State v. Woods*, 4th Dist. No. 09CA3090, 2009-Ohio-6169, ¶ 25. Thus, under the first part of the *Strickland* test, appellant's assertion that his trial counsel's representation was deficient for failing to inquire further into M.V.'s statements made during the May 28, 2020 police interview is without merit.

{¶ 34} Even had the conduct of appellant's counsel at trial been deficient, appellant has not demonstrated how the failure to elicit more evidence from the May 28, 2020 police interview with M.V. prejudiced him. In the statement at issue, appellant's counsel claimed M.V. stated appellant "had his hands forward and did grab [M.M.] by the neck" before allegedly stumbling forward due to his inebriation. (Tr. Vol. II at 138.) For the purposes of determining guilt under R.C. 2919.25, it is inapposite whether, after appellant grabbed M.M.'s throat, he pinned her against the wall intentionally or via a drunken stumble. The act of grabbing his daughter's throat is sufficient to prove he "knowingly cause[d] * * * physical harm to a family or household member," and M.V.'s purported statement to Detective Monturo would readily clear that threshold. R.C. 2919.25(A). Even if it had been alleged appellant grabbed his daughter's throat recklessly, rather than knowingly, that too would have been sufficient to support a conviction for domestic violence. *See* R.C. 2919.25(B). Appellant does not adequately explain how revealing such information to the jury would have aided in his defense. Thus, under the second part of the *Strickland* test, failure of appellant's counsel to conduct further questioning into the May 28, 2020 police interview did not prejudice appellant.

{¶ 35} Accordingly, appellant's second assignment of error is overruled.

## C. Third Assignment of Error

{¶ 36} In his third assignment of error, appellant contends his convictions are against the manifest weight of the evidence.

{¶ 37} " '[T]he criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief,' " requiring this court "to determine whether the state's evidence or the defendant's evidence was more persuasive." *State v. Zhu*, 10th Dist. No. 21AP-10, 2021-Ohio-4577, ¶ 33, quoting *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38. An appellate court in determining whether a conviction is against the manifest weight of the evidence reviews the entire record, " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and

determines whether[,] in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1997). We will reverse a conviction on manifest weight grounds only "in the most exceptional case where the evidence weighs heavily against the conviction." *Zhu* at ¶ 33, citing *Cassell* at ¶ 40.

{¶ 38} In conducting a manifest weight review, an appellate court must " 'afford great deference to the jury's determination of witness credibility.' " *Starling v. Ohio Dept. of Dev. Disabilities*, 10th Dist. No. 21AP-345, 2022-Ohio-2225, ¶ 15, quoting *State v. Albert*, 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 14. The trial court as finder of fact, whether jury or judge, is indisputably in the best position " 'to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). " 'Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds.' " *Zhu* at ¶ 34, quoting *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25.

{¶ 39} In order for appellant to be found guilty of assault against M.V., the state had to prove appellant "knowingly cause[d] or attempt[ed] to cause physical harm" to M.V. R.C. 2903.13(A). "[S]erious physical harm" to M.V. caused recklessly is also sufficient to justify a conviction for assault. R.C. 2903.13(B). Similarly, in order for appellant to be found guilty of domestic violence against M.M., the state had to prove appellant "knowingly cause[d] or attempt[ed] to cause physical harm" to M.M. R.C. 2919.25(A). "[S]erious physical harm" to M.M. caused recklessly is also sufficient to justify a conviction for domestic violence. R.C. 2919.25(B).

{¶ 40} Appellant contends his convictions for assault and domestic violence are against the manifest weight of the evidence. Essentially, appellant asserts the jury should have given more weight to his testimony than the testimonies of M.V. and M.M. "A conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the appellant's version." *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 16, citing *State v. Neff*, 10th Dist. No. 09AP-360, 2009-Ohio-6846, ¶ 18. Simply put, by its decision to convict appellant for assault and

domestic violence, the jury chose to disbelieve appellant and instead to believe the accounts of M.V. and M.M. The record is replete with evidence to support the jury's conclusions, and for that reason, this is certainly not one of those "exceptional case[s]" in which "the evidence weighs heavily against the conviction." *Zhu* at ¶ 33, citing *Cassell* at ¶ 40. Thus, this court affords great deference to the jury's credibility determinations and concludes appellant's convictions for assault and domestic violence are not against the weight of the evidence.

{¶ 41} Accordingly, appellant's third assignment of error is overruled.

## IV. Conclusion

{¶ 42} For the foregoing reasons, we overrule appellant's three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and BOGGS, JJ., concur.